Argued and submitted November 5, 2013, at Franklin High School, Portland, Oregon, decision of Court of Appeals and judgment of circuit court affirmed May 30, 2014

In the Matter of A. J. C.,
a Youth.

STATE OF OREGON,
*Respondent on Review,*

*v.*

A. J. C.,
*Petitioner on Review.*

(CC J100537; CA A147559; SC S061191)

326 P3d 1195

Christa Obold-Eshelman, Youth, Rights and Justice, Portland, argued the cause and filed the brief for petitioner on review.

Anna M. Joyce, Solicitor General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief was Ellen F. Rosenblum, Attorney General.

Kevin M. Sali, Angeli Law Group LLC, Portland, filed the brief for *amicus curiae* ACLU of Oregon, Inc. With him

on the brief was Kevin Diaz, ACLU Foundation of Oregon, Inc.

Before Balmer, Chief Justice, and Kistler, Walters, Linder, Landau, and Baldwin, Justices.**

BALDWIN, J.

---

** Brewer, J., did not participate in the consideration or decision of this case.

## BALDWIN, J.

The juvenile court took jurisdiction over youth for conduct that, if committed by an adult, would constitute possession of a firearm in a public building, ORS 166.370; unlawful possession of a firearm, ORS 166.250; unlawful use of a weapon, ORS 166.220; and menacing, ORS 163.190. The question presented on review is whether the school-safety exception to the warrant requirement announced in *State ex rel Juv. Dept. v. M. A. D.*, 348 Or 381, 233 P3d 437 (2010), permitted a school principal to conduct a warrantless search of youth's backpack after the principal had seized the backpack from youth. The juvenile court concluded that the search was permissible under the school-safety exception, and it denied youth's pretrial motion to suppress. The Court of Appeals affirmed that decision. *See State v. A. J. C.*, 254 Or App 717, 295 P3d 1157 (2013). For the reasons stated below, we now affirm.

We state the historical facts consistently with the juvenile court's findings, which are supported by the record. *See, e.g., Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968). This case arises from a threat that youth made against another student, V, with whom he had had a relationship. Youth and V attended the same high school and, one evening, youth called V and told her that he was going to bring a gun to school to shoot her and other students. When V arrived at school the next morning, she informed Glader, a school counselor, about the threats. Glader then contacted Smith, the principal of the school, and informed him of the threats.

Smith was not familiar with V, who was a new student to the school. Smith was familiar with youth, a student with past disciplinary issues. Smith had worked with youth and youth's family in resolving those issues, and, when Smith heard of the threat, he considered it to be "outside the realm" of what he thought could happen. However, Smith did not feel that he was in a position to disregard the threat until it was investigated.

In investigating the credibility of the threat, Smith first called on the assistance of Officer Chertude, a deputy sheriff who contracted with the school. Chertude arrived at

the school in a marked patrol vehicle within minutes. Smith also called youth's mother and requested that she come to the school. While youth's mother was en route, Smith conducted an independent search of youth's locker, but he found no evidence corroborating the threat. Once youth's mother arrived at the school, Smith went to youth's classroom. Youth was seated at his desk with his backpack underneath his seat. Smith picked up youth's backpack and asked youth to accompany him to his office. Youth calmly stood up and followed Smith to his office. Smith carried youth's backpack as they walked. Smith also kept close to youth in the hallway because youth was wearing a baggy jacket and Smith knew that a student could hide weapons in such clothing.

Smith still had control of youth's backpack when they reached his office. Smith, youth, youth's mother, and Chertude then entered Smith's office together.[1] Smith sat at his desk and placed the backpack at his feet and away from youth, who sat across from Smith and next to his mother. Chertude, who was in uniform and carrying a holstered firearm, stood to the side. Chertude explained to everyone that he was there as an observer and that the situation was not yet a criminal matter. Smith then began interviewing youth. Smith informed youth that V had "said that you were going to bring a gun to school and shoot [her] today and that that threat happened last night over a series of either text or phone calls." Youth denied making such a threat. Smith then inquired about youth's relationship with V, asking why she would make up such an allegation. Smith indicated that he had "a hard time believing a new student to our building is just going to make up a story, so I have to take it seriously. I don't have any reason to believe that she's lying to me, so what happened?" Youth then admitted to having had some sort of relationship with V and stated that "she called me, too, and she texted me, too." Several minutes into the interview, Smith informed youth that, "with this kind of verbal threat, I need to check and see * * * if this is true or not. So I have to follow through in my processes here, so I'm going to search your backpack." Youth did not either object or give consent, and Smith began the search.

---

[1] At some later point, a family friend of youth also arrived at the school and joined the meeting in Smith's office.

The backpack, which remained at Smith's feet, contained five or six compartments. Smith opened the major compartment first and found nothing incriminating. Smith next opened a smaller second compartment that was approximately eight inches long and eight inches wide. At the bottom of that compartment, Smith found several .45-caliber bullets. Smith then opened a third compartment and found a .45-caliber handgun wrapped in a bandana. Smith passed the handgun to Chertude, who checked to see that it was unloaded and then disengaged it. Chertude handcuffed youth and read him his *Miranda* rights.

Before trial, youth moved to suppress evidence of the handgun and bullets, arguing that Smith's warrantless search of the backpack violated his rights under Article I, section 9, of the Oregon Constitution. The state responded that the search was permitted under the school-safety exception to the warrant requirement articulated in *M. A. D.*, 348 Or 381. Under that exception, if a school official reasonably suspects that an individual on school property poses an immediate threat to the safety of others at the school, the official may take reasonable measures in response, including conducting a limited, warrantless search. *Id.* at 392-93.

At a hearing on youth's motion, youth argued that the school-safety exception did not apply because (1) Smith did not have reasonable suspicion to support his search, and (2) the search was not justified under the circumstances presented. Youth more specifically contended that Smith had not received credible information and therefore did not reasonably suspect that youth possessed a weapon. Additionally, youth argued that, because Smith had control over the backpack at the time of the search and youth was calm and compliant, there was no longer an immediate threat justifying the search of his backpack without a warrant.

The juvenile court disagreed. It concluded that, within the confines of the school-safety exception, Smith "did have a reasonable suspicion that there w[ere] imminent health or safety threats or risk to the students [of] the school." The juvenile court found that the report of the threat was credible because V and youth were both identified by name; the threat was specific in nature—*i.e.*, youth

bringing a gun to shoot V; the threat was current because it was made the night before the school officials were alerted; and, when interviewed, youth acknowledged that he had had some sort of relationship with V. Based on those circumstances, the juvenile court concluded that, at the time of the search, Smith reasonably suspected that the report of the threat was credible and that the risk to students at the school was immediate.

The juvenile court further concluded that Smith's search of the backpack was reasonable under the circumstances presented. It explained:

"I would note that in the course of the search, that search took a very specific process. [Smith] did not search small or tiny compartments. He searched compartments in the backpack that would reasonably hold an item that was alleged to have been brought on the campus: a gun. So he didn't open small containers or examine small containers. He opened portions of the backpack that would reasonably contain a weapon.

"And first he finds the bullets. That gives him a reason beyond any kind of common sense to believe that the other compartments might hold a gun, because bullets, of course, have no value without a gun. And, of course, in the very next compartment, he finds a gun. So stated in short, that search was no further intrusive than it needed to be."

Thus, the juvenile court held that Smith's search did not violate youth's constitutional rights, and it therefore denied youth's motion to suppress.

Youth's case proceeded to trial, and the juvenile court ultimately found youth to be within its jurisdiction. Youth appealed, and the Court of Appeals affirmed. It too concluded that Smith's search had fallen within the school-safety exception to the warrant requirement for two reasons. First, based on the same factors that the juvenile court had identified, the Court of Appeals agreed that Smith had reasonably suspected that youth had brought a gun to school for purposes of harming V or others. *A. J. C.*, 254 Or App at 723. Moreover, it concluded that Smith's response to the risk of harm—*i.e.*, conducting the limited search of the backpack—was reasonable under the circumstances. It explained:

"Smith was confronted with an immediate threat both to a named student and to the general safety of the school. As noted, Glader told Smith that, in addition to V, youth might have threatened other, unidentified students. Smith did not know the type or size of the gun that youth reportedly had brought to school or the manner in which youth possessed it. That is, Smith did not know whether youth was carrying the gun on his person, had the gun in his backpack, or had concealed it somewhere else inside the school. Thus, Smith was faced with the choice of returning the unopened backpack to youth, his mother, or the family friend, searching elsewhere in the school, or searching youth's person. Smith chose to search the backpack, and, in light of the other options, that choice was reasonable; it was the most likely to reveal a gun and dissipate the safety threat without further intrusions or delay. For those reasons, in light of the nature of the safety threat, Smith's decision to search youth's backpack was reasonable."

*Id.* at 725 (internal footnote omitted).

We granted youth's petition for review. On review, youth maintains that the warrantless search was not justified under the school-safety exception to the Article I, section 9, warrant requirement.[2] Youth does not renew his argument that Smith lacked reasonable suspicion, based upon specific and articulable facts, that youth might have possessed contraband that posed a danger to others in the school. Rather, youth argues only that, under the circumstances at the time that Smith conducted the search, the search was not justified because youth no longer posed an immediate safety risk.

Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to searched, and the person or thing to be seized."

---

[2] Youth's argument is confined to Article I, section 9, of the Oregon Constitution. He does not argue that the search violated his rights under the Fourth Amendment to the United States Constitution.

As a general rule, Article I, section 9, requires state officials to obtain a warrant before conducting a search, and a warrantless search is considered *per se* unreasonable unless it falls within one of the carefully delineated exceptions to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983).

In *M. A. D.*, we acknowledged that the protections guaranteed under Article I, section 9, extend to students attending public schools. 348 Or at 394. However, we recognized that those protections may yield to permit school officials to undertake reasonable protective measures—such as conducting a limited search—in response to credible safety threats in a school setting. In so doing, we articulated the following exception to the warrant requirement:

> "[W]hen a school official develops a reasonable suspicion, based on specific and articulable facts, that a particular individual on school property either personally poses or is in the possession of some item that poses an immediate threat to the safety of the student, the official, or others at the school, the school official must be allowed considerable latitude to take safety precautions."

*Id.* at 392-93 (internal quotation marks and citation omitted). We held that, if the protective actions taken by a school official—such as a limited search—are based on specific and articulable facts, and are reasonable, the school official's conduct does not violate Article I, section 9. *Id.* at 394.

In formulating that exception in *M. A. D.*, we analogized it to the long-standing and well-defined officer-safety exception to the warrant requirement. Under the officer-safety exception, a police officer may take "reasonable steps" to protect the officer or others if, "during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987); *see also State v. Foster*, 347 Or 1, 7-8, 217 P3d 168 (2009) (same). Such "reasonable steps" may include a limited search of a citizen's belongings. And, the permissible range of such a limited search turns on the nature of the threat in light of the specific and

articulable facts known. In *State v. Ehly*, 317 Or 66, 83, 854 P2d 421 (1993), we declined to adopt "a bright-line rule to the effect that an officer may never search an item that has been seized." Instead, we announced that "[o]ur inquiry is whether the steps taken by an officer were reasonable under the circumstances as they appeared to the officer at time that the decision was made." *Id.*; *see also M. A. D.*, 348 Or at 392 n 5 ("Our officer-safety cases make it clear that the permissible scope of a search depends on nature of the safety threat.").

In applying the officer-safety exception, this court has further emphasized that our assessment of the reasonableness of a police officer's actions must take into account the concerns that police officers face in the field:

> "[I]t is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

*Bates*, 304 Or at 524-25.

Notably, although we drew guidance from the officer-safety exception in formulating the school-safety standard in *M. A. D.*, we recognized that the school context is "sufficiently different from the setting in which ordinary police-citizen interactions occur." *M. A. D.*, 348 Or at 391; *see also id.* at 393 ("We do not mean to suggest that the officer-safety doctrine and a school official's search of a student for drugs are identical in all respects."). We observed that, in the school environment, "large numbers of children are required to gather each day in an institutional setting where government employees are responsible for their safety and education and where the necessity for swift and informal disciplinary procedures is apparent." *Id.* at 390-91 (internal quotation marks and citation omitted); *see also* ORS 339.010 (regarding compulsory attendance). Further, we noted that

various statutes underscore the obligation that school officials have to provide a safe campus environment, and that our case law has recognized a special duty that educators owe children entrusted to their care. *M. A. D.*, 348 Or at 391 (citing, for example, ORS 339.250(3) (authorizing discipline, suspension, or expulsion of student who assaults others at the school) and *Fazzolari v. Portland School Dist. No. 1J*, 303 Or 1, 19-20, 734 P2d 1326 (1987) (recognizing special duty of care)).

In *M. A. D.*, we further concluded that the concerns that police officers face in the field also apply to school officials confronting credible safety threats in a school setting. We therefore recognized that, similarly to the "considerable latitude" provided to police officers making life-or-death decisions in the field, the school setting "raises heightened safety concerns" that necessitate "considerable latitude" for school officials to take "prompt, reasonable steps" to remove an imminent threat. *Id.* at 392-93. We explained:

> "As persons responsible for maintaining a safe learning environment, when school officials perceive there to be an immediate threat to student or staff safety at a school, they must be able to take prompt, reasonable steps to remove that threat. As with an officer-safety search, when a school official develops a 'reasonable suspicion,' based on 'specific and articulable facts,' that a particular individual on school property either personally poses or is in the possession of some item that poses an 'immediate threat' to the safety of the student, the official, or others at the school, the school official 'must be allowed considerable latitude to take safety precautions.' *See Foster,* 347 Or at 8 (quoting *Bates,* 304 Or at 524-25) (internal quotation marks omitted). Moreover, as this court has noted with respect to an officer's judgment in that context, it is not our function to 'uncharitably second-guess' the considered protective actions taken by school officials. *See id.* (quoting *Bates,* 304 Or at 524) (internal quotation marks omitted)."

*Id.* Thus, although we announced an exception that is somewhat coextensive with the officer-safety exception to the warrant requirement, we articulated a standard applicable to school settings that takes into account the unique environment of those settings.

On review, youth now argues that, given the overlap between the officer-safety exception and the school-safety exception articulated in *M. A. D.*, this court should adhere to the limitations on searches that are well-established in the officer-safety context. Youth acknowledges that the limitations of reasonable suspicion searches in an officer-safety context are not enforced by way of a bright-line standard. *See Ehly*, 317 Or at 83 (so stating). However, youth submits that this court has determined generally that, within the officer-safety context, a warrantless search is no longer justified once an officer has seized a closed container from a suspicious individual. Youth specifically relies on *State v. Rudder*, 347 Or 14, 217 P3d 1064 (2009), in which this court held that a police officer was not justified in searching inside of a defendant's bulging pocket after he had resisted a patdown of the pocket and had been handcuffed. In so doing, we explained that, in the context of a police officer's warrantless search of a citizen:

> "The question that courts must confront * * * is whether the *particular* step taken by the police was one that was reasonable under the *particular* circumstances, not whether that step was within the range of reasonable responses to officer safety concerns *in general.*
>
> "We emphasize that the concept of reasonableness in this context is not biased in favor of the concerns of the police. Although this court is sensitive to the dangers inherent in police work and to the difficulties inherent in officer safety decisions, that does not and cannot mean that we regard those concerns as having greater weight than the constitutional right of all persons—even those who have been stopped on suspicion of criminal activity—to be free of unreasonable searches and seizures. If that constitutional right is to retain any vitality in the context of police stops, police officers must understand that the officer safety doctrine does not excuse protective measures that are disproportionate to any threat that the officers reasonably perceive."

*Id.* at 22-23 (emphasis in original; footnote omitted). In examining whether the police officer's actions of handcuffing the defendant and then searching his pocket were proportional to the perceived threat in *Rudder*, we further

stated that "[t]he Constitution requires us to adhere to the principle that an officer's reasonable suspicion that a suspect might have a weapon on the suspect's person can justify a patdown, but that something more—such as, for example, a reasonable belief that the suspect is reaching for that weapon—is required to justify a more intrusive search." *Id.* at 25.

Youth argues that, under *Rudder*, a school official's reasonable suspicion that a student might have a weapon can justify a seizure and patdown, but that something more— for example, a reasonable belief that the student is reaching for a weapon—is required to justify a more intrusive search. *See also State v. Gilkey/White*, 172 Or App 95, 101-02, 18 P3d 402 (2001) ("In general, when officers discover a closed container that may contain a weapon, the seizure of the container is sufficient to protect officer safety—and a warrantless search of the container is, thus, not justified by officer safety concerns."); *State v. Booker*, 110 Or App 6, 9, 820 P2d 1378 (1991) ("[N]either the purse nor anything inside it was a threat to [the officer] once he had seized it.").

Here, youth contends that Smith's search was more intrusive than was reasonably necessary under the particular circumstances at the time of the search because any immediate threat had dissipated once Smith had seized the backpack from youth. Youth specifically notes that, at the time that Smith conducted the search, Smith had possession of the backpack securely in his office and out of youth's reach. Further, youth was calm and compliant and was surrounded by Smith, a deputy sheriff, and his mother. Thus, youth contends that the only perceived threat—*i.e.*, that youth might access a weapon—had ceased to exist. Youth therefore submits that, without more, such as youth reaching for the bag, the scope of the invasion was not justified under the circumstances.

Youth is correct that, in viewing whether a response to a credible and imminent safety threat was reasonable, the question that courts must ask—whether it be in an officer-safety or school-safety context—is whether the particular steps were reasonable under the particular circumstances presented. *See Rudder*, 347 Or at 25. However, as we

recognized in *M. A. D.*, the differences between an officer-citizen context and a school context matter in assessing whether protective measures are reasonable. As we emphasized in *M. A. D.*, the circumstances of an imminent safety threat—supported by specific and articulable facts—to individuals in a school setting is accompanied by additional considerations. Those considerations include the fact that young students are confined in close-quarters on a school campus that they are compelled to attend, and the fact that school officials have a heightened standard of care to students and adults in that environment. Significantly, as this case indicates, a specific, articulated threat of violence in a school setting may concern the well-being of numerous individuals confined in a school environment. In other words, when considering whether a school official's particular actions were reasonable under the totality of the circumstances, the unique features of the official's responsibilities and the school setting must also factor into the assessment.

Turning to the facts in this case, we hold that Smith's search of youth's backpack was reasonable under the circumstances present when he conducted the search. Here, the information known to Smith went beyond a generalized safety threat. In this case, V personally had informed Glader of a targeted threat that youth had made to her the night before that he was going to bring a gun to school to shoot V and possibly other students. Glader immediately relayed that information to Smith. Although Smith testified that youth's threat was "outside the realm" of what he thought could happen, Smith did not think that he could readily discount the reliability of V's account of the threat. Further, youth verified under questioning that he and V had been involved in some sort of a relationship. That acknowledgment by youth strengthened the credibility of the earlier information that Smith had received. Taken as a whole, the totality of the information known to Smith was sufficient for him to reasonably suspect that youth possessed a firearm for the purpose of shooting one or more students.

Additionally, Smith's actions in responding to the threat were particularized to the circumstances known to him. Smith reasonably suspected that youth might have brought a gun to school to shoot V and possibly other students,

but he was not aware of the type or location of the gun. At that point, Smith had determined only that the gun was not in youth's locker.[3] Smith had not yet determined where the gun was located. Youth had been on campus on his own for a period of time before he was brought into Smith's office. No matter where the gun was located, whether it was in youth's immediate possession or not, it presented a danger to students. As a result of those factors, the threat of harm to others remained imminent at the time of the search.

It was therefore reasonable for Smith to make reasonable efforts to find the gun and eliminate the threat of harm. A limited search of the parts of youth's backpack that could contain the gun was therefore reasonable. At that point, verifying that a gun was in the backpack, and taking control of that gun, eliminated the immediate risk that youth posed to the individuals in Smith's office and to others at the school. Further, that verification would tend to negate the possibility that a firearm was located elsewhere on campus. Conversely, verifying that a weapon was not in the backpack would demonstrate that further investigation of other areas may be appropriate. In addition, in examining the contents of the backpack, Smith undertook a systematic and not overly intrusive search of the backpack. Smith searched only those closed compartments of the backpack that conceivably could have held a firearm. Once he located a firearm, he ceased searching the bag. We will not now uncharitably second-guess his actions or demand that he could have performed the least intrusive search that we can conceive with the benefit of hindsight.[4] Thus, we conclude that Smith's actions were reasonable under the circumstances and youth's rights under Article I, section 9, were not violated.

Finally, in concluding that Smith's search was reasonable, we emphasize that the permissible range of options

---

[3] Youth does not argue that Smith's actions in searching his locker violated his rights.

[4] We also observe that Officer Chertude's presence as a law enforcement official does not alter the analysis under the facts of this case. As noted, Officer Chertude was present during the search in a supportive role only. He did not conduct a search nor did he direct Smith to do so. We therefore have no reason to decide whether different considerations may apply when a police officer conducts a search of a student on school grounds in response to a credible safety threat.

available to Smith was not unlimited. Although we acknowledge that searches performed in a school setting require taking into account the unique context of the school environment, the permissible scope of a school official's precautionary actions based on imminent safety concerns remains confined by the specific and articulable facts of each case. *See M. A. D.*, 348 Or at 393-94 (declining to adopt a general rule sanctioning "warrantless searches whenever a school official has reasonable suspicion that a student possesses evidence of a violation of a school rule or policy"). Thus, school officials are not licensed to engage in an unlimited search of students and their belongings on campus based on generalized threats to safety. Sanctioning such searches would fail to safeguard the Article I, section 9, rights of students that this court has recognized.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.